[Cite as *In re D.Y.*, 2015-Ohio-4335.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY


In re D.Y., C.Y.                                    Court of Appeals No. WD-15-039

                                                   Trial Court No. 2013 JZ 0654/0655


                                                   **DECISION AND JUDGMENT**

                                                   Decided:  October 19, 2015

                              * * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
Charles S. Bergman, Assistant Prosecuting Attorney, for appellee.

Christopher M. Frasor, for appellant.

                              * * * * *

**SINGER, J.**

{¶ 1} Appellant, P.Y., appeals from the judgment of the Wood County Court of

Common Pleas, Juvenile Division, terminating the parental rights of appellant and M.Y.

("mother"), and granting permanent custody of the minor children to appellee, Wood

County Department of Job and Family Services.  Mother voluntarily relinquished her

parental rights to the children and is not a party to this appeal. For the reasons that follow, we affirm the trial court's judgment.

{¶ 2} Appellant sets forth one assignment of error:

The trial court erred when granting permanent custody without determining the wishes of the minor children in accordance with Ohio Revised Code §2151.414 and finding permanent custody was in the best interest of the minor children is against the manifest weight of the evidence.

## Background

{¶ 3} Appellant is the biological father of the two minor children at issue in this appeal: D.Y. (born in June 2009) and C.Y. (born in December 2010).

{¶ 4} Appellee first became involved with the family in 2012, due to complaints that the children were not being properly cared for and supervised by the parents. At that time, appellant was married to mother and living with mother and the children in an apartment. The children were adjudicated dependent but remained in the home with the parents under appellee's protective supervision. A case plan was filed on October 10, 2012, with the goal to prevent the children's removal from the home. The case plan included the following requirements: the parents submit to drug, alcohol and mental health assessments and counseling; the children would be supervised by an adult at all times; and the parents would refrain from drinking alcohol while caring for the children.

{¶ 5} In February 2013, appellant and mother separated after they had an argument and appellant was arrested for domestic violence and resisting arrest. Appellee

2.

then received several reports that appellant "had shown up at the apartment and at daycare intoxicated," although appellant claimed he had not been at the home since February 2013.

{¶ 6} On May 2, 2013, the case plan was amended to add anger management services for appellant. Appellant completed an anger management program.

{¶ 7} On May 22, 2013, appellee received a call that the children were playing in the parking lot of the apartment complex unsupervised.

{¶ 8} On June 13, 2013, the police received a complaint that the children were wandering around the apartment complex unsupervised. When the police responded and took the children back to their apartment, the door to the apartment was open and mother was asleep on the couch.

{¶ 9} On June 30, 2013, appellee received a report that the children were again left unsupervised. On that same day, appellee requested that the juvenile court issue an emergency pick up order for the children.

{¶ 10} On July 1, 2013, by magistrate's order, appellee was granted temporary custody of the children. Also on that day, appellee filed a complaint alleging the children were abused. A shelter care hearing was held on July 3, 2013, at which both parents appeared; temporary custody of the children remained with appellee.

{¶ 11} On July 5, 2013, an amended case plan was filed, which contained additional matters, including a visitation plan that provided for restricted, supervised

visits for appellant and mother with the children. Also on that day, a court-appointed special advocate/guardian ad litem (CASA/GAL) was chosen to represent the children.

{¶ 12} On August 1, 2013, a hearing was held; both parents were present and represented by counsel. The parents stipulated that the children were neglected. Over the next few months, a dispositional hearing was held, as were several review hearings. At the May 8, 2014 review hearing, custody of the children was returned to mother, with appellee having protective supervision. On May 14, 2014, an amended case plan was filed. In the months that followed, several review hearings were conducted.

{¶ 13} In September 2014, appellant left Ohio to attend an alcohol treatment facility in Missouri. Due to this change, appellee removed appellant from the case plan.

{¶ 14} Beginning November 1, 2014, mother contacted appellee several times to report she could not handle D.Y.'s behaviors. As a result, on November 4, 2014, appellee filed an emergency motion for custody of D.Y., and appellee received temporary custody of D.Y. An emergency hearing was held; neither parent appeared. Temporary custody of D.Y. was continued with appellee. An amended case plan was filed.

{¶ 15} On November 10, 2014, appellee asked for and received temporary custody of C.Y. An emergency hearing was held; neither parent appeared. Appellee's temporary custody of C.Y. was continued. An amended case plan was filed. In the next few months, two review hearings were held.

{¶ 16} On February 17, 2015, appellee moved for permanent custody of the children.

4.

**Permanent Custody Hearing**

{¶ 17} A permanent custody hearing was held on May 12, 2015. Mother and her counsel were at the hearing. Mother's counsel advised the court that mother did not object to appellee receiving permanent custody of the children. Under oath, mother consented to permanent custody of the children being placed with appellee. Mother and her counsel then left the hearing. Appellant was not present at the hearing as he was still at the treatment facility in Missouri. However, appellant's counsel was at the hearing and participated. Amy Weaks, a caseworker for appellee, testified at the hearing, as did the children's CASA/GAL, Tresa Witker.

{¶ 18} Weaks testified to the following. She was assigned to work with the family on August 4, 2014, at which time the children were living with mother and her boyfriend. The children were first in appellee's temporary care from June 30, 2013 until May 8, 2014, when the children were reunified with mother, as mother had completed most of the items on the case plan. D.Y. was removed from mother's home on November 4, 2014, at mother's request; C.Y. was removed on November 10, 2014. The children were placed together in a foster home, which was a different foster home from their initial placement.

{¶ 19} There was an initial case plan and amendments to the plan, which included adding mother's boyfriend and removing appellant. Mother completed portions of the case plan, but after the children were returned to the home, she did not continue with parenting classes or the children's therapies because Medicaid had lapsed. In addition,

5.

the family was evicted from their home and lost their transportation so the children were not getting to school regularly. After the children were removed from the home in November 2014, mother had visitation with the children and attended 11 out of 48 visits.

{¶ 20} Concerning appellant's participation in the case plan, although he completed an outpatient drug and alcohol program, there were still concerns that appellant was drinking and not able to provide for the children. Appellant consistently attended visits with the children, after they were first placed in appellee's temporary care, but there were issues with his parenting style. Appellant would get angry with the children and "wouldn't know how to parent them * * * he wanted to physically discipline" the children. Then in August 2014, he went to a residential treatment center in Missouri where he remained at the time of the hearing. He was due to graduate from the program in September 2015, but it was recommended that he remain in Missouri for up to six months at a halfway house. He last saw the children in August 2014, just prior to leaving for treatment.

{¶ 21} With respect to housing, Weaks could not assess appellant's home because he "doesn't currently have a home to be assessed" since he was in an inpatient program.

{¶ 22} Appellant did not complete the case plan services ordered by the court as he must still take and complete parenting classes. Weaks opined it usually takes four to six months to complete the classes, "depending on the intensity of what [he] would require."

6.

**{¶ 23}** Appellant was employed and paid child support when the children were in the first foster home, but he has not paid any child support for the children since he went into the treatment facility, as he has not been employed while there.

**{¶ 24}** Regarding C.Y., he was diagnosed with hypertonic cerebral palsy and has global developmental delays and possible seizure disorder. It was recommended that C.Y. receive speech, occupational and physical therapies. C.Y. completed physical therapy while in his first foster home. Now, in his second foster home, C.Y. continues to undergo speech and occupational therapies and attends a special preschool.

**{¶ 25}** Regarding D.Y., he was diagnosed with ADHD. He has counseling and sees a psychiatrist. It was also recommended that D.Y. have a diagnostic assessment. The foster parent is getting D.Y. to his services.

**{¶ 26}** With respect to a relative placement, Weaks talked to both parents and explored placing the children with a relative but concluded there were no appropriate or willing relatives with which to place the children. There was one relative on mother's side who was interested, however, mother "was not really willing to work with [that relative]" to have the children. Weaks also talked to the paternal grandparents. While grandmother would like to do it, she did not feel it was fair to the children or herself. Grandfather was unable to take the children. In addition, "[t]here was also a sister that had expressed an interest," but she had three small children of her own, and felt it would be too much with D.Y. and C.Y.

7.

{¶ 27} Weaks noted the children were bonded to their current foster mother and the foster mother does an excellent job with the children and their behaviors. The foster mother takes the children to their recommended therapies and provides for their basic needs.

{¶ 28} Weaks recommended permanent custody so the children could be adopted.

{¶ 29} Witker testified she was the CASA/GAL serving in the best interest of the children. She conducted an investigation by meeting with the children on three occasions, looking at the records and talking with various people including the paternal grandparents, the caseworker, the foster mother and D.Y.'s kindergarten teacher.

{¶ 30} Witker testified she asked the children if they liked living with their foster mother and whether they wanted to live with their mother; the children did not respond one way or the other. She testified she did not ask the children their wishes about living with appellant because appellant had been removed from the case plan, so appellee was not working toward reunifying the children with him. She testified that even if the children would have indicated that they wanted to live with appellant, she would still have concluded it was not in their best interest to live with him.

{¶ 31} Witker filed a report and recommendation on May 5, 2015, advising that permanent custody of the children be awarded to appellee. In the report, she set forth she had tried to contact mother since February 23, 2015, but was unable to reach mother. Witker attempted to attend a visit between mother and the children, but mother did not appear for the visit.

8.

**{¶ 32}** In the report, Witker noted she spoke on the phone with the paternal grandmother. Grandmother had visits with the children and had a good time. Grandmother was concerned about what would happen if the children were adopted and that appellant really did not have a say in what was occurring. Grandmother visited appellant recently and was very pleased with his progress. Grandmother indicated it was recommended that appellant remain in Missouri for another six months after he graduates from the program so he can stay in a halfway house and have a job.

**{¶ 33}** Witker also spoke on the phone with the paternal grandfather. Grandfather visited with the children and reported their behaviors were age-appropriate. He too was concerned about appellant's position in the permanent custody proceeding, and that it was too late for appellant to do anything to keep the children.

**{¶ 34}** Witker indicated in her report that she was in regular contact with Weaks and was updated on mother's relationship, employment and living situation.

**{¶ 35}** Witker noted in the report that D.Y.'s teacher said his behavior in school had been really bad lately. The teacher did not believe D.Y. was getting his medication, but the teacher could not reach the foster mother to leave a message. The teacher thought D.Y. could do better academically if he had help at home with math and reading.

**{¶ 36}** In the report, Witker also set forth that she met and spoke with the children's foster mother, who has been their foster parent since November 2014. The foster mother said the children seemed to be misbehaving more now than they did in the first four months that they lived with her. The foster mother thought the children's visits

9.

with mother as well as mother's broken promises to the children were causing the children to act out inappropriately. The foster mother stated D.Y. was getting the same medication and the same dosage every day, and she relayed this information to D.Y.'s teacher right away. The foster mother also stated she helps D.Y. with his homework and reads to him.

{¶ 37} Witker spoke with D.Y. who talked about his paternal grandparents, but he did not mention his mother. When Witker met with C.Y., she noticed he liked to be with the foster mother and he did whatever D.Y. did. Witker also said the children did not bring up appellant at all in the conversation.

**Judgment Entry**

{¶ 38} In the May 15, 2015 judgment entry, the trial court made numerous findings, based on clear and convincing evidence. In addition, the court denied appellant's request for additional time so that he could complete the one year treatment program. The court noted while appellant was set to graduate from the treatment program on September 13, 2015, it was recommended that he then live in a halfway house for up to six months.

{¶ 39} The court observed that initially, appellee offered protective supervision so the children could remain in the home with their parents. Appellant was ordered to complete an assessment and parenting classes and to take steps to address his drug and alcohol issues. Appellant attended outpatient chemical dependency programs, but the programs were not successful.

10.

{¶ 40} The court noted that before appellant went to the treatment program in Missouri, his monitored visits with the children were not going well. Appellant was often frustrated with the children and would curse at them and threaten to spank them. Many times the children would cry during their visits with appellant. In addition, appellant made several threats to a worker at the facility where the visits were held, so services at that facility were discontinued due to safety concerns.

{¶ 41} The court found appellee made reasonable efforts to return the children to their parents by offering the parents a wide variety of resources and opportunities. The court found the parents demonstrated a lack of commitment toward the children and the parents are unwilling to provide food, clothing, shelter and other basic necessities. The court also noted appellant's inability to maintain stable housing and to provide consistent education and medical services for the children. The court observed, since September 2014, appellant has had correspondence by mail with the children, occurring with unknown frequency, and one phone call with the children, but he has not seen the children. The court further found appellant failed to consistently financially support the children, as ordered by the court, because he has not paid child support since September of 2014, when he entered the treatment program. The court determined the children cannot or should not be placed with either parent within a reasonable period of time.

{¶ 42} The court also found, at the time of the hearing, the children's needs were adequately addressed in their foster home. The court concluded the children's need for a legally secure placement cannot be achieved without a grant of permanent custody.

11.

## The Appeal

### Standard – Permanent Custody

{¶ 43} A trial court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy Jones*, 10th Dist. Franklin Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312, ¶ 28. The factual findings of a trial court are presumed correct since, as the trier of fact, the court is in the best position to weigh the evidence and evaluate the witnesses' testimony. *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). Hence, a judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 44} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, two statutory prongs: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6. Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be

established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

## A. Factors Under R.C. 2125.414(B)(1)

{¶ 45} The first prong of the permanent custody analysis requires the court to make a finding, by clear and convincing evidence, of one of the factors under R.C. 2151.414(B)(1). Here, the court applied the factors under subsections (a) and (d).

{¶ 46} R.C. 2125.414(B)(1)(a) and (d) state:

[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period.

{¶ 47} R.C. 2151.414(E) directs a court to "enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either

parent" where it finds by clear and convincing evidence that "one or more" of the factors listed under R.C. 2151.414(E) exist. Here, the court considered R.C. 2151.414(E)(1), (4) and (14), which provide:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

{¶ 48} Ohio courts have consistently held that "[n]on-compliance with a case plan is grounds for termination of parental rights." (Citation omitted.) *In re St.L.*, 6th Dist. Fulton No. F-13-002, 2013-Ohio-4414, ¶ 9-10.

## B. Best Interest Factors

{¶ 49} The second prong of the analysis requires the court to consider the best interest of the child. To satisfy the best interest prong of the permanent custody test, appellee was required to establish, by clear and convincing evidence, that permanent custody to the agency is in the best interest of the children based on an analysis under R.C. 2151.414(D). The trial court must consider all relevant factors, including: the interaction and interrelationship of the children with their parents, siblings, relatives, foster caregivers and out-of-home providers; the wishes of the children; the custodial history of the children; the children's need for permanence.

{¶ 50} Ohio case law is clear that as part of the analysis of the best interest of the child, the trial court must consider "'[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child.'" (Citations omitted.) *In re J.K.*, 6th Dist. Lucas No. L-14-1225, 2015-Ohio-1393, ¶ 32. A trial court commits reversible error by granting permanent custody of a child

15.

when the record lacks evidence of the child's wishes. *In re Swisher*, 10th Dist. Franklin Nos. 02AP-1408, 02AP-1409, 2003-Ohio-5446, ¶ 41.

## Analysis

{¶ 51} Appellant contends the trial court erred in failing to determine the wishes of the children when it granted permanent custody of the children to appellee, and the court erred in finding permanent custody would serve the children's best interest.

{¶ 52} Appellant does not dispute the trial court's determination, under the first prong of the permanent custody test, that pursuant to R.C. 2151.414(B)(1)(a) and (d), the children cannot be placed with him within a reasonable time and the children were in appellee's custody for at least 12 months out of 22 consecutive months prior to the filing of the motion for permanent custody. Therefore, we will only review the trial court's determination with respect to the second prong of the test.

## Wishes of the Children

{¶ 53} The record shows the trial court did consider the wishes of the children, as expressed by Witker, the CASA/GAL. Witker testified at the hearing that in her conversation with the children she asked them if they liked living with their foster mother and whether they wanted to live their mother. Witker said the children did not respond one way or the other. Witker also stated that the children did not mention appellant at all. Witker testified even if the children would have expressed that they wanted to live with appellant, she would still have concluded it was not in their best interest to live with appellant. The court set forth in its judgment entry that the children "appear to be 'happy

16.

and comfortable' living in their current foster home * * * [and] have not asked nor spoke about their mother with [the CASA/GAL]. See [the CASA/GAL report]." The court also acknowledged the young ages of the children, as they were five, almost six, and four years of age at the time of the hearing. Based on the foregoing, we find the record contains competent and credible evidence that the trial court did consider the children's wishes when it granted permanent custody to appellee.

### Children's Best Interest

{¶ 54} As regards the best interest factors, specifically the children's relationships, the court found and the record reveals mother voluntarily relinquished her rights to the children and has no relationship with them.

{¶ 55} The record further shows appellant has not lived with the children since February 2013, and has not seen them since late August or early September 2014, prior to leaving for treatment. He has spoken with the children once and has corresponded by mail with the children since that time. Therefore, the children's relationship with appellant was very limited during the nine months prior to the hearing and it was likely that appellant and the children would continue to have a limited relationship for at least four months and perhaps as many as ten months after the hearing due to appellant's treatment and aftercare services. Moreover, prior to going to treatment, appellant's visits with the children were not going well and many times the children would cry during their visits. Appellant did not complete parenting classes as ordered.

17.

**{¶ 56}** The record indicates the children enjoyed visits with their paternal grandparents.

**{¶ 57}** The court concluded and the evidence reveals the children's needs are being met in the foster home and they are bonded to their foster mother. The foster mother relates well to the children and addresses their behaviors. In addition, the children receive the recommended therapies, counseling and services.

**{¶ 58}** As set forth above, the trial court considered the wishes of the children, as expressed by the CASA/GAL. The record supports such a finding.

**{¶ 59}** With respect to the children's custodial history, the trial court recognized "[d]espite their young ages, both [of the children] have had an extended custodial history." The court outlined the numerous places and people with whom the children have resided. The children initially lived with the parents, then lived just with mother, then stayed with acquaintances, then lived in a foster home, then moved back in with mother and then lived in another foster home.

**{¶ 60}** The record shows the children were moved around between family, friends and a foster home before settling into a different foster home. The children have been in their current foster home since November 2014, and appear "happy and comfortable."

**{¶ 61}** The trial court found the children were in need of a legally secure permanent placement and the only means for the children to obtain such a placement was for appellee to be granted permanent custody. The court noted "[s]peculating that

18.

[appellant] may - in a period of time anywhere from 10 to 16 months at a minimum - might be in a position to raise [the children] - is hardly what is best for [the children]."

{¶ 62} A review of the record reveals appellant is not in a position to assume custody of the children, as there is no evidence that he has permanent, suitable housing for himself or the children. Moreover, it was recommended that appellant live in a halfway house for six months after he leaves the treatment program, and there is no evidence that the children could or should live with him at a halfway house. In addition, while there is evidence that, in the past, appellant was employed and supported the children, he has not been employed or supported the children since he left Ohio for the treatment facility. Thus, appellant has no income, and there is no evidence of a viable plan for appellant to provide support for his children. What is more, appellant has virtually no relationship with the children and he has not completed parenting classes. Although appellant has made efforts to make improvements in his life by seeking treatment, which efforts are commendable, he has not achieved the level of stability necessary to care for and nurture the children now or in the foreseeable future.

{¶ 63} The record also reveals both the caseworker and the CASA/GAL concur that termination of the parents' rights and permanent custody of the children to appellee would be in the children's best interest.

{¶ 64} Accordingly, the trial court's judgment granting permanent custody of the children to appellee is supported by clear and convincing evidence and is not against the

19.

manifest weight of the evidence. Appellant's assignment of error is therefore not well-taken.

{¶ 65} On consideration whereof, the judgment of the Wood County Court of Common Pleas, Juvenile Division, is affirmed. Costs of this appeal are assessed to appellant pursuant to App.R. 24.

                                                            Judgment affirmed.


        A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.          _____
                                                JUDGE

Arlene Singer, J.          

James D. Jensen, J.               _____
CONCUR.                                         JUDGE

                                  _____
                                                JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.